## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| EILEEN MASTERSON-CARR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. N12C-11-107 MJB |
| | ) | |
| ANESTHESIA SERVICES, P.A., | ) | |
| MARK SCHNEIDER, M.D., and | ) | |
| KEN SILVERSTEIN, M.D., | ) | |
| | ) | |
| Defendants. | ) | |

**Submitted:** May 14, 2015
**Decided:** August 28, 2015

### SUPPLEMENTAL DECISION AFTER TRIAL

Michele D. Allen, Esq., Law Office of Michele D. Allen, LLC, 724 Yorklyn Road, Suite 300, Wilmington, Delaware 19707; Gerald R. Clarke, Esq., Clarke and Associates, 119 S. Easton Road, Suite 207, Glenside, Pennsylvania 19038, *Attorneys for Plaintiff.*

Laurence V. Cronin, Esq., Smith, Katzenstein & Jenkins LLP, 800 Delaware Avenue, 10th Floor, P.O. Box 410, Wilmington, Delaware 19899, *Attorney for Defendants.*

**BRADY, J.**

1

## I. INTRODUCTION

On November 3, 2012, Eileen Masterson-Carr ("Plaintiff") filed suit against her former employer, Anesthesia Services P.A. ("ASPA"), ASPA's Chairman of the Board Mark Schneider M.D. ("Schneider"), and ASPA's CCO Ken Silverstein M.D. ("Silverstein") (collectively "Defendants"). Plaintiff initially alleged six claims: (1) ASPA breached her Employment Contract; (2) ASPA breached the implied covenant of good faith and fair dealing; (3) Plaintiff was defamed by members of ASPA, including Silverstein and Schneider; (4) ASPA violated the Delaware Wage Payment and Collection Act by failing to pay Plaintiff her 6.5% bonus for time worked in 2012; (5) Silverstein and Schneider tortuously interfered with Plaintiff's Employment Contract; and (6) ASPA acted in a way justifying promissory estoppel. On March 21, 2013, upon Defendant's motion, the Court dismissed Plaintiff's promissory estoppel claim. Subsequently, on March 18, 2014, Plaintiff stipulated to the dismissal of her claim for breach of the implied covenant of good faith and fair dealing.

The parties elected to have a bench trial on the remaining four claims. Trial began on April 3, 2014 and ended on April 7, 2014.[1] Following closing arguments, the Court ruled that Plaintiff was entitled to her 6.5% bonus for time worked in 2012 but reserved decision regarding the specific amount to which Plaintiff is entitled. The Court also reserved decision on Plaintiff's allegation that she was wrongfully terminated. In a post-trial decision dated September 25, 2014, the Court ruled that Plaintiff was not terminated but resigned.

At trial, Plaintiff suggested that even if the Court found that Plaintiff technically resigned, Plaintiff might still recover on the theory that she had been "constructive[ly]

---

[1] The parties submitted a Joint Exhibit Binder. Exhibits from the Joint Exhibit Binder shall be cited as "Joint Ex." The transcript of April 3, 2014 will be cited as "T1." The transcript of April 4, 2014 will be cited as "T2." The transcript of April 7, 2014 will be cited as "T3."

discharged."[2] The Court reserved decision on the constructive discharge issue until it had made its finding of fact on the issue of whether Plaintiff was actually discharged or resigned.[3] In its post-trial decision, the Court determined that Plaintiff resigned and permitted the parties additional briefing on the constructive discharge issue. Because the Court found that the issue of Plaintiff's alleged constructive termination was intertwined with the remaining claims for tortious interference and defamation, the Court also reserved decision on these issues pending supplemental briefing.

Plaintiff filed her post-trial opening brief on January 20, 2015.[4] Defendants filed their answering brief on March 23, 2015.[5] Plaintiff filed a reply on April 22, 2015.[6] Defendants requested oral argument, and oral argument was held on May 14, 2015, at which time the Court reserved decision on the pending matters.[7] Having heard oral argument and reviewed all of the parties' submissions, the Court now finds that Plaintiff's constructive termination claim is barred and that Plaintiff has failed to establish tortious interference or defamation.

## II. BACKGROUND

### A. The Structure of ASPA

ASPA is a professional services corporation, organized under the laws of Delaware, that is involved in the practice of medicine.[8] ASPA is comprised of approximately thirty-one physicians, some of whom are shareholders, as well as other medical personnel, including nurses. The company's Board of Directors ("Board") is composed of shareholder-members of

---

[2] T3 at 197.
[3] T3 at 234.
[4] Opening Brief, Item 79.
[5] Answering Brief, Item 81.
[6] Reply Brief, Item 82.
[7] Judicial Action Form, Item 85.
[8] Employment Agreement, Joint Ex. 4, at 1.

3

ASPA.[9]  ASPA's governance structure initially included a Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), and Chief Clinical Officer ("CCO").[10]  However, in approximately 2011, ASPA modified its governance structure, changing the executive positions.[11]  The CEO became the Chairman of the Board ("Chairman"), the CCO remained, the CFO became the Treasurer, and ASPA created a new position, the Chief People Officer ("CPO").[12]  Like under the former structure, all executive members were elected by the Board. [13]

ASPA's corporate structure also includes an Executive Committee.[14]  The Executive Committee has the responsibility, on behalf of the Board, "for managing the business and affairs of [ASPA] between meetings of the Board in order to provide an efficient, expeditiously assembled forum to investigate, discuss, analyze, oversee and make decisions regarding day-to-day operations of the Corporation."[15]  Additionally, a critical part of the Executive Committee's function is to "make recommendations to the Board with respect to corporate policies and practices and on all matters requiring Board action."[16]  At all times relevant to the instant matter, the Executive Committee was comprised of the Chairman, CCO, CPO, Treasurer, two at-large members, who were elected by the Board, and the Executive Director, who was responsible for overseeing ASPA's administration.[17]

---

[9] ASPA Bylaws, Joint Ex. 5, at 2.
[10] ASPA Bylaws, Joint Ex. 5, at 42.
[11] ASPA Bylaws, Joint Ex. 5, at 7.
[12] ASPA Bylaws, Joint Ex. 5, at 7.
[13] ASPA Bylaws, Joint Ex. 5, at 7.
[14] ASPA Bylaws, Joint Ex. 5, at 5.
[15] ASPA Bylaws, Joint Ex. 5, at 5.
[16] ASPA Bylaws, Joint Ex. 5, at 7.
[17] ASPA Bylaws, Joint Ex. 5, at 7.

4

Dr. Schneider joined ASPA in 1988 and has served as a board member since 1989.[18] Schneider became CEO (later titled Chairman) in 2010 and was integral to managing ASPA.[19] Dr. Silverstein currently serves as ASPA's CCO and, like Schneider, is a shareholder-board member.[20] Because he is the CCO, Silverstein also sits on the Executive Committee.

## B. Plaintiff's Employment with ASPA

In 2008, Plaintiff was hired as Executive Director of ASPA.[21] Plaintiff's primary duties as Executive Director included "overseeing billing and collection by [ASPA's] third party billing company, assisting with billing compliance issues, negotiating managed care contracts, monitoring the performance of vendors providing services to [ASPA], overseeing [ASPA's] malpractice and other insurance carriers, and addressing health and benefit plan administration."[22] Plaintiff signed an employment contract with ASPA, providing that either party could terminate "without stated cause by giving the other party at least ninety (90) days' advance written notice of intent to terminate."[23]

Under her contract, Plaintiff is eligible to receive severance compensation in the event of termination of the employment contract "(i) by [ASPA] without cause . . . ; or (ii) by [Plaintiff] with cause (but only if [Plaintiff] has properly fulfilled all other contractual obligations)."[24] The contract provides that, after the Plaintiff's first year of employment with

---

[18] T2 at 38-39. Schneider left ASPA for a few years around 1999 to 2001 but subsequently returned to the practice. T2 at 38-39.
[19] T2 at 41-44.
[20] T2 at 142.
[21] T1 at 25.
[22] Employment Agreement, Joint Ex. 4, at 1.
[23] ASPA Bylaws, Joint Ex. 5, at 3.
[24] Employment Agreement, Joint Ex. 4, at 7.

ASPA, "a sum equal to ninety (90) days salary shall be payable to [Plaintiff] as severance."[25] The parties agree that Plaintiff would not be entitled to severance if she (i) was terminated by ASPA with cause or (ii) resigned from ASPA without cause.

On April 16, 2012, Plaintiff's employment with ASPA ended. At trial, Plaintiff maintained that she was terminated without cause by the Executive Committee. Defendants maintained that Plaintiff voluntarily resigned when she was told that the Executive Committee would recommend her termination to the Board. Both parties agreed, and it is clear from the record, that the relationship between Plaintiff and ASPA had been eroding for some time before Plaintiff's employment ended. Defendants alleged that the erosion was caused by Plaintiff's labor law violations and other misconduct including gossiping about doctors' personal lives.[26] Plaintiff denied any misconduct and attributed the erosion of the relationship to disagreement concerning the direction that the company was taking and alleged personal animus from Dr. Schneider and Dr. Silverman.[27]

## III. STANDARD OF REVIEW

The Court is the finder of fact in a bench trial.[28] The plaintiff must prove each element of her claim by a preponderance of the evidence, meaning that the Court shall find in favor of the party upon whose side "the greater weight of the evidence is found."[29] Because the Court is the finder of fact, it is up to the Court to weigh the credibility of witnesses and resolve conflicts in witness testimony.[30]

---

[25] Employment Agreement, Joint Ex. 4, at 7.
[26] T2 at 90-91; T2 at 126.
[27] T2 at 45-50.
[28] *Pencader Associates, LLC v. Synergy Direct Mortg. Inc.*, 2010 WL 2681862, at *2 (Del. Super. June 30, 2010).
[29] *Id.* (quoting *Pouls v. Windmill Estates, LLC,* 2010 WL 2348648, at *4 (Del. Super. June 10, 2010)).
[30] *Id.* at *3.

## IV. THE COURT FOUND THAT PLAINTIFF RESIGNED

### A. Trial Testimony

Plaintiff testified that she had a "confrontation" with Silverstein in late March 2012.[31] Plaintiff testified that after this confrontation, she texted her husband to tell him that she thought that she had just lost her job.[32]  Silverstein confirmed that he had had a hostile interaction with Plaintiff in late March.[33]  Silverstein testified that he apologized two days after the incident, but he did not feel like the issue was completely resolved.[34]  Nonetheless, Silverstein testified that "so far as [he] knew, that was the end of it."[35]

Plaintiff testified that the week before her employment with ASPA ended, on April 11, 2012, she received a phone call from Dr. Nick Gagliano, who was one of the ASPA partners.[36]  According to Plaintiff, Dr. Gagliano, who did not testify at trial, asked Plaintiff if she was aware that Dr. Schneider, who was then Chairman of the Board, and Dr. Lucente, who was then HR Officer, had been meeting behind closed doors.[37]  Schneider confirmed in his trial testimony that he had a private conversation with Dr. Lucente on April 10, 2012, concerning alleged misconduct by Plaintiff.[38]  Plaintiff testified that she told Dr. Gagliano that she was not aware of these meetings.[39] Plaintiff testified that Dr. Gagliano expressed concern that Plaintiff, as Executive Director, was unaware of these meetings between the Chairman

---

[31] T1 at 50-51.
[32] T1 at 51.
[33] T3 at 149-52.
[34] T3 at 151.
[35] T3 at 151.
[36] T1 at 52
[37] T1 at 52.
[38] T3 at 56-57.
[39] T1 at 52.

7

and the HR Officer.[40]  Plaintiff testified that she concluded that she had been excluded from these meetings because they concerned her.[41]

Plaintiff testified that, a couple days later, on Friday, April 13, 2012, Plaintiff heard that "a serious HR issue was going to be announced next week."[42]  Plaintiff also testified that she received a "very odd text [message]" from Tina Smith, who handled general HR issues, saying that she would not be in that day and would not be available by phone.[43]  Plaintiff testified that, under these circumstances, she further concluded that the HR announcement would involve her.[44]

Plaintiff testified that, on Monday, April 16, 2012, she contacted Schneider and Dr. Lucente in two separate phone calls to ask them what was going on.[45]  Plaintiff maintains that she confronted both Schneider and Lucente, telling both of them that Plaintiff knew something was going on that involved her.[46]  Plaintiff alleges that neither Schneider nor Lucente would provide her with any details, but Lucente finally told Plaintiff that Mary Quinn, an HR consultant who had been working with ASPA, was scheduling a meeting concerning the issue.[47]  In his trial testimony, Dr. Lucente confirmed that he did speak by phone with Plaintiff that morning and that he told Plaintiff that he could not discuss the details of the upcoming meeting.[48]  Plaintiff testified that she then asked Mary Quinn, who told her

---

[40] T1 at 52.
[41] T1 at 53.
[42] T1 at 54.
[43] T1 at 54.  Tina Smith also did not testify at trial.
[44] T1 at 54.
[45] T1 at 55.
[46] T1 at 55.
[47] T1 at 55.
[48] T3 at 17.

8

that the meeting was scheduled for around 11:30 a.m. that morning.[49]  Plaintiff testified that she thought that she was being terminated and began to pack up her office.[50]

The parties agreed that sometime after 11:00 a.m., Dr. Schneider, Dr. Lucente, Mary Quinn, and Dr. Chua[51] came into Plaintiff's office.  Plaintiff alleges that Schneider opened the meeting by telling her that the Executive Committee had made a unanimous decision to terminate Plaintiff for cause.[52]  Schneider, Lucente, and Quinn allege that Schneider only told Plaintiff that the Committee was *recommending* termination with cause.[53]  Dr. Chua also confirmed that the position that Schneider communicated to Plaintiff was that the Executive Committee was going to make a "termination recommendation."[54]

Plaintiff testified that she asked Schneider what the cause was, and he would not go into detail, but told her that the cause was related to a comment Plaintiff made about other physicians in the group in front of staff as well as Plaintiff's speaking about employee health issues in front of the staff.[55]  Plaintiff testified that at the time she did not know what the comment was.[56]  In his trial testimony, Schneider confirmed that he gave Plaintiff "a couple of examples" of the issues that were the basis for the Executive Committee's decision, but Schneider did not specifically identify at trial what these examples were.[57]

Schneider alleged that he explicitly told Plaintiff that she was not being terminated.[58]  According to Schneider's testimony, they told her, "We're not terminating you. We're

---

[49] T1 at 55.  The issue of this conversation confirming the meeting time was not explored in Mary Quinn's trial testimony.
[50] T1 at 56.
[51] Dr. Chua was another member of the Executive Committee.
[52] T1 at 56.
[53] T1 at 70-71; T3 at 17-18; T3 at 79.
[54] T3 at 208.
[55] T1 at 57.
[56] T1 at 57.
[57] T2 at 71.
[58] T2 at 70-71.

9

recommending this termination. But the issues are significant, and we don't think they're recoverable."[59] Schneider testified that he then told Plaintiff that she could resign instead.[60]

Schneider, Lucente, and Quinn all testified that there was some additional discussion after which Plaintiff said, "I resign."[61] Schneider testified that Plaintiff agreed to follow up with a written letter confirming her resignation.[62] Plaintiff did not dispute that she said the words "I resign." However, Plaintiff alleged that she only said these words in response to the question of what she wanted to tell the staff.[63]

The parties agreed that, at some point in the meeting, Schneider recommended that Plaintiff leave the office. Plaintiff said that she wanted to say goodbye to the staff. Plaintiff testified that Schneider asked her what she was going to tell the staff.[64] Plaintiff testified that because she did not know why she was being terminated and because she did not want to place the administrative staff in an uncomfortable position, Plaintiff told Schneider, "I will tell them that I resigned."[65] Plaintiff testified that she then proceeded to go out and say goodbye to the administrative staff. Plaintiff told some of them that she had resigned.[66]

It was undisputed that Plaintiff received a follow-up email from Dr. Schneider on April 19, 2012.[67] Plaintiff subsequently received a letter from Dr. Schneider on behalf of ASPA, stating that Plaintiff had resigned and presenting a proposed severance agreement.[68] It

---

[59] T2 at 70-71.
[60] T2 at 70.
[61] T2 at 71; T3 at 18 ; T3 at 79.
[62] T2 At 71.
[63] T1 at 59.
[64] T1 at 59.
[65] T1 at 59.
[66] T1 at 59. However, according to Plaintiff's testimony, she told all of the physicians that she had been terminated. T1 at 60.
[67] Schneider Email, Joint Ex. 34,
[68] The letter, dated April 30, 2012, stated, "[a]s you stated on Monday, April 16, 2012, and as we discussed, you have voluntarily resigned your employment with Anesthesia Services, P.A., ("ASPA") effective April 16, 2012." Letter to Masterson-Carr, Joint Ex. 29. Plaintiff acknowledged receipt of this letter in her testimony at trial. T1 at 60-61.

was undisputed that Plaintiff never submitted a written termination letter and never signed a separation agreement.[69] On May 3, 2012, Plaintiff sent a letter to the Executive Committee as well as to numerous members of the Board.[70] In the May 3 letter, Plaintiff stated that she had been terminated "for cause" but that she did not understand what the cause was.[71] Plaintiff testified that she sent this letter in response to the correspondence she had received from ASPA saying that she had resigned, and she wanted to make clear that this was untrue.[72]

### B. The Court Found that Plaintiff Resigned from ASPA

Considering the totality of the evidence presented, the Court found it more likely than not that Plaintiff resigned from ASPA. In reaching this determination, the Court found three factors particularly compelling. First, the Court found compelling Plaintiff's deposition testimony in which she made it clear that, when confronted with the dissatisfaction of the Executive Committee, she saw herself as having "a choice" to resign, and she "chose that choice [i.e., to resign]."[73] When asked the clarificatory question, "What you then in response chose was to resign?", Plaintiff answered, "I did."[74]

The Court also found compelling Plaintiff's subsequent correspondence with ASPA. This correspondence included an April 19 confirmation email from Dr. Schneider, stating that Plaintiff had resigned.[75] Plaintiff confirmed that she made no effort to contact Dr. Schneider or dispute his characterization of her as having resigned.[76] When Dr. Schneider subsequently sent Plaintiff a letter, dated April 30, once again confirming her resignation and asking for a

---

[69] T1 at 60.
[70] Masterson-Carr Letter, Joint Ex. 7.
[71] Masterson-Carr Letter, Joint Ex. 7, at 1.
[72] T1 at 63.
[73] Masterson-Carr Deposition, Joint Ex. 30, at 97-98.
[74] Masterson-Carr Deposition, Joint Ex. 30, at 98.
[75] Schneider Email, Joint Ex. 34.
[76] T1 at 134.

written resignation letter, Plaintiff did not respond directly.[77] Instead, a couple weeks later, after retaining counsel in this matter, Plaintiff sent a letter to various ASPA board members stating that she had been terminated.[78] Finally, the Court found compelling Plaintiff's testimony concerning her general willingness to resign her job in the event of certain sorts of disagreement, including statements that she would "walk away graciously" from ASPA "if there was ever a time that anyone did not think [Plaintiff] was right for the job."[79]

## V. POST-TRIAL BRIEFING

### A. Plaintiff's Opening Brief

*i. Constructive Termination*

Plaintiff argues that her resignation was given in response to a situation that amounted to an ultimatum—either resign or be fired—and that such resignations have been found to constitute "constructive discharge" under Delaware law.[80] Plaintiff maintains that there was no cause for her termination under the circumstances, and hence she is entitled to the remedy under her employment contract for termination "without cause."[81] Plaintiff further alleges that she is entitled to damages for Dr. Schneider and/or Dr. Silverstein's tortiuous interference with her employment contract and for alleged defamatory statements by Dr. Schneider.[82]

Plaintiff argues that Delaware recognizes the concept of constructive discharge as set forth by the United States Supreme Court in *Pennsylvania State Police v. Suders*, where the Court held that "under the constructive discharge doctrine, an employee's reasonable decision

---

[77] T1 at 138-39.
[78] Masterson-Carr Letter, Joint Ex. 7.
[79] Masterson-Carr Deposition, Joint Ex. 30, at 147.
[80] Opening Brief, Item 79, at 14.
[81] Opening Brief, Item 79, at 15.
[82] Opening Brief, Item 79, at 15.

12

to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes."[83] Plaintiff argues that constructive discharges in Delaware fall into two categories: (1) ultimatums to resign or (2) poor working conditions, the former of which applies to the instant case.[84] In the case of an ultimatum, it is necessary that the individual conveying the information to the employee must have sufficient authorization by the employer for the ultimatum to carry sufficient weight.[85] The individual relaying the message must be in a position of authority in the company.[86] Plaintiff argues that the party issuing the ultimatum in the instant case, Dr. Schneider, was in such a position of authority as he was the Chair of the Board and hence "clearly has sufficient authority to bind the corporation."[87]

Plaintiff argues that constructive termination has been found in cases of much less dire ultimatums than the one Plaintiff faced. Plaintiff cites *PAL of Wilmington v. Graham*, a case in which the employee resigned rather than agree to the employer's proposed plan, which included a reevaluation after thirty days.[88] The employee in *Graham* interpreted the plan as an ultimatum, which "implied the intention to terminate [the employee] at the end of 30 days."[89] Plaintiff argues that her situation was clearly more serious than that in *Graham*. Whereas the employee in *Graham* at least had the possibility that things could change after thirty days, Plaintiff was told that her situation was not "recoverable."[90] Plaintiff further argues that "[w]hen faced with the prospect of imminent or immediate termination, Delaware

---

[83] Opening Brief, Item 79, at 16 (*quoting Pennsylvania State Police v. Suders*, 124 S.Ct. 2342, 2344 (2004)).
[84] Opening Brief, Item 79, at 16 (*citing Ingleside Homes v. Gladden*, 2003 WL 22048205,*8 (Del. Super. Ct. Aug. 27, 2003) (explaining that of the two constructive discharge situations, "[t]he first, more traditional, and common situation involves an employer giving an employee an ultimatum with regard to the employment")).
[85] Opening Brief, Item 79, at 16 (*citing State v. Potter*, 2011 WL 5966720, *2 (Del. Super. Ct. Nov. 29., 2011).
[86] Opening Brief, Item 79, at 17 (*citing Anchor Motor Freight v. Unemployment Ins. Appeal Bd.*, 325 A.2d 374 (Del. Super. Ct. 1974)).
[87] Opening Brief, Item 79, at 17.
[88] Opening Brief, Item 79, at 17 (*citing PAL of Wilmington v. Graham*, 2008 WL 2582986 (Del. Super. Ct. June 18, 2008).
[89] Opening Brief, Item 79, at 17 (*citing Graham*, 2008 WL 2582986, at *2).
[90] Opening Brief, Item 79, at 17-18.

courts have found that decisions to resign in order to preserve future employment opportunities or for other personal reasons are consistent with a finding of constructive discharge."[91] Plaintiff argues that she reasonably realized that termination was imminent and, as the Court found, Plaintiff was preserving "her future employment opportunities and self-image by her resignation."[92]

Plaintiff says that she is entitled to the remedies under her employment contract for termination without cause because a "for cause" termination requires the employer to follow certain procedural requirements, including providing written notice and some effort at corrective action.[93] As neither of these requirements was met, Plaintiff argues that her termination must be considered to be without cause.[94] Plaintiff further argues that the employment agreement was not actually terminated until the June 8, 2012 correspondence from Defendants' attorney to Plaintiff's attorney.[95] Plaintiff argues that she is entitled to her prorated salary from April 16, 2012 until June 8, 2012, which is approximately $32,700.[96] As the employment agreement provides for 90 days' advance written notice, Plaintiff argues that she is also entitled to her salary during the 90-day notice period beginning on June 8, 2012 (approximately $56,250).[97]

In addition to her prorated salary during the time leading up to the June 8, 2012 letter and the subsequent 90-day notice period, Plaintiff contends that she is entitled to the following: (1) severance equal to 180 days of compensation ($112,500); (2) a bonus for the

---

[91] Opening Brief, Item 79, at 18 (*citing Thompkins v. Franciscan Elder Care*, 2008 WL 2602171, *2 (Del. Super. Ct. June 27, 2008) (The UIAB found constructive discharge where the employee chose to resign to avoid "tarnish(ing) his employment history with a termination" when told he was going to be "let go").

[92] Opening Brief, Item 79, at 18 (*quoting* Decision After Trial, Item 71, at 18).

[93] Opening Brief, Item 79, at 18.

[94] Opening Brief, Item 79, at 18-19.

[95] Opening Brief, Item 79, at 19.

[96] Opening Brief, Item 79, at 19.

[97] Opening Brief, Item 79, at 19.

period of time her contract was in force in 2012 (though the end of the 90-day notice period); (3) pension contributions (made at the same rate as were made for senior board members during the plan year) for 270 days after June 8, 2012 (the notice period plus the severance period); (4) long term care insurance for Plaintiff and her husband; and (5) all legal fees and costs in bringing this action.[98]

## ii. Tortious Interference

Plaintiff cites the elements of tortious interference with contract as: (1) the existence of a contractual relation between the plaintiff and a third party; (2) purposeful action by the defendant intended to harm the existing contractual relation; (3) the absence of privilege or justification on the part of the defendant; and (4) resulting actual damages.[99]

Regarding the second prong of the elements of tortious interference, Plaintiff alleges that Dr. Schneider "took very specific, unilateral, and often secretive action to ensure the termination of the Plaintiff's contract."[100] Plaintiff argues that, at each step in the process, the specific reasons and the depth of the investigation into Plaintiff's alleged misconduct were obscured from other parties that were supposed to be involved in the decision.[101] Plaintiff alleges that Schneider fostered the impression among members of the Executive Committee that (a) a more complete investigation would be conducted regarding the alleged inappropriate comment by Plaintiff; (b) Plaintiff would have the opportunity to respond to the individual who reported the alleged comment; and (c) there were other performance issues about which Plaintiff have been counseled in the past.[102] Plaintiff alleges that none of these impressions

---

[98] Opening Brief, Item 79, at 19-20.
[99] Opening Brief, Item 79, at 20 (*citing UbiquiTel v. Sprint*, 2005 WL 3533697, *5 (Del. Ch. Dec. 14, 2005)).
[100] Opening Brief, Item 79, at 20.
[101] Opening Brief, Item 79, at 20-21.
[102] Opening Brief, Item 79, at 21.

15

turned out to be the case.[103]  Plaintiff alleges that Schneider was well aware of the economic and non-economic damage that termination would cause to Plaintiff, including loss of salary, reduced future job prospects, and damage to Plaintiff's self-esteem.[104]

Plaintiff argues that Schneider and Silverstein "acted in concert," motivated by personal animus, to ensure the termination of Plaintiff's contract.[105]  Plaintiff alleges that Dr. Schneider was angry at Plaintiff for pointing out inconsistencies in his communications with the Board, and Dr. Silverstein was motivated by a recent personal clash with Plaintiff.[106] Plaintiff additionally argues that neither Schneider nor Silverstein are immunized from corporate officer liability because they used "wrongful means" in terminating Plaintiff for personal reasons.[107]

Plaintiff states that although she held a consulting position for 15 months after her separation from ASPA, she has been unemployed for the majority of her post-ASPA time.[108] Accordingly, Plaintiff asks that damages be measured "from the day separated forward, offsetting the compensation received from [Plaintiff's] consulting assignment."[109]

### iii. Defamation

Plaintiff cites the four elements of a cause of action for defamation in Delaware (1) a false and defamatory statement concerning another; (2) unprivileged publication to a third party; (3) at least negligence on the part of the publisher; and (4) either actionability

---

[103] Opening Brief, Item 79, at 21.
[104] Opening Brief, Item 79, at 21.
[105] Opening Brief, Item 79, at 22.
[106] Opening Brief, Item 79, at 22.
[107] Opening Brief, Item 79, at 21-22 (*citing Smith v. Hercules*, 2002 WL 499817, *3 (Del. Super. Ct. Mar. 28, 2002)).
[108] Opening Brief, Item 79, at 23.
[109] Opening Brief, Item 79, at 23.

irrespective of special harm or the existence of special harm caused by publication.[110]

Plaintiff argues that she was falsely portrayed by Dr. Schneider as "an individual who is uncooperative in the face of necessary improvements" to the business.[111] Plaintiff says that Dr. Schneider was quick to tell the physician members of the Executive Committee that Plaintiff had made the alleged statement about another physician member of ASPA having an affair, and that Dr. Schneider did so without conducting a reasonable investigation into whether Plaintiff actually made the statement.[112] Plaintiff argues that while the full extent of the damages from these statements is not presently known, "it is a reasonable presumption that the small healthcare community in Delaware would take notice when the top non-physician employee of such a large physician group in the state is unceremoniously displaced."[113]

### B. Defendants' Answering Brief

*i. Constructive Termination*

Defendants argue that Plaintiff is precluded from now arguing constructive discharge because constructive discharge requires that the employee resigned her position, and Plaintiff maintained throughout the pleadings and at trial that she did not resign, but was terminated.[114] Defendants argue that while a plaintiff may advance alternative theories of recovery, a plaintiff cannot advance to different claims once trial has begun when the claims depend on

---

[110] Opening Brief, Item 79, at 23 (*citing Stevens v. Independent Newspapers*, 1988 WL 25377, *2 (Del. Super. Ct. Mar. 10, 1988)).
[111] Opening Brief, Item 79, at 23.
[112] Opening Brief, Item 79, at 23-24.
[113] Opening Brief, Item 79, at 24.
[114] Answering Brief, Item 81, at 6.

17

contradictory factual assertions.[115] Defendants maintain that in order to claim constructive discharge, the plaintiff must admit that she resigned.[116] Defendants argue that it is inappropriate for Plaintiff, having lost on her termination claim at trial, to now be permitted to argue that she was forced to resign.[117] Defendants also contend that the constructive discharge claim should be barred as it was not pled in the complaint and the possibility of a constructive termination theory was not raised until the pretrial conference.[118]

Defendants further argue that allowing Plaintiff to now claim that she resigned, when she maintained throughout trial that she was terminated, runs afoul of the well-established doctrine of judicial admissions.[119] Judicial admissions are "[v]oluntary and knowing concessions of fact made by a party during judicial proceedings (e.g., statements contained in pleadings, stipulations, depositions, or testimony; responses to requests for admissions; counsel's statements to the court)."[120] Judicial admissions "are traditionally considered binding upon the party against whom they operate, and upon the court."[121] Defendants maintain that Plaintiff is now bound by her trial testimony (i.e., "I did not resign").[122]

Defendants argue that the cases cited by Plaintiff in her opening brief lack precedential value because they are all Superior Court appellate review decisions of Unemployment Insurance Appeals Board ("UIAB") decisions, and Delaware courts have consistently rejected attempts to apply termination precedent from UIAB appeal cases to other types of termination

---

[115] Answering Brief, Item 81, at 6 (*citing Schwartzkopf v. Brunswick Corp.*, 833 F.Supp.2d 1106, 1121 (D.Minn. 2011) ("Constructive discharge is necessarily inconsistent with termination, because it requires the employee to resign his position" (emphasis in original))).

[116] Answering Brief, Item 81, at 7 (*citing Smith v. Delaware State University*, 47 A.3d 472, 476 (Del. 2012)).

[117] Answering Brief, Item 81, at 7.

[118] Answering Brief, Item 81, at 8.

[119] Answering Brief, Item 81, at 12.

[120] Answering Brief, Item 81, at 12 (*quoting Merritt v. United Parcel Service*, 956 A.2d 1196, 1201 (Del. 2008)).

[121] Answering Brief, Item 81, at 12 (*quoting Merritt*, 956 A.2d at 1201-02).

[122] Answering Brief, Item 81, at 13 (*quoting* T1 at 139).

claims.[123] Defendants also argue that these cases are all distinguishable from the instant case because in each case the employee admitted they resigned, whereas Plaintiff consistently maintained at trial that she was terminated.[124] Finally, Defendants argue that even if Plaintiff has decided to resign, the decision would not have been a reasonable response to an imminent threat as would be required to show constructive discharge.[125] Assuming, *arguendo,* that Plaintiff resigned, Defendants argue that Plaintiff's action was unreasonably premature and that she should have waited to see how the ASPA Board would respond to the recommendation of the Executive Committee.[126]

### ii. Tortious Interference

Defendants first argue that there can be no tortious interference with Plaintiff's employment contract unless the contract was actually breached by ASPA.[127] Defendants maintain that as Plaintiff resigned, ASPA did not breach the contract.[128] Specifically, Defendants argue that the tortious interference requires that the alleged tortfeasor(s) use wrongful means "to induce a third party to terminate a contract."[129] Defendants maintain that the third party in the instant case, ASPA, did not terminate the contract.

Additionally, Defendants argue that Schneider and Silverstein are shielded from liability as officers or directors of ASPA.[130] Personal liability of an officer or director

---

[123] Answering Brief, Item 81, at 14 (*citing Meades v. Wilmington Housing Authority*, 2003 WL 939863, *6 (Del. Ch. Mar. 6, 2003)).
[124] Answering Brief, Item 81, at 15.
[125] Answering Brief, Item 81, at 16.
[126] Answering Brief, Item 81, at 16. Defendants cite *Rizzitiello v. McDonald's*, 868 A.2d 825 (Del. 2005) in support of their contention that a reasonable employee would have waited "to allow her employer to make the decision as to her continued employment."
[127] Answering Brief, Item 81, at 18.
[128] Answering Brief, Item 81, at 18.
[129] Answering Brief, Item 81, at 19 (*quoting ASDI, Inc. v. Beard Research*, 11 A.3d 749, 751 (Del. 2010)).
[130] Answering Brief, Item 81, at 17.

requires that the officer or director exceeded the scope of his authority.[131]    Further, Defendants argue that even when directors act, in part, with adverse motives this does not necessarily mean that they acted outside the scope of their authority.[132]  Defendants argue that there is no evidence that Schneider or Silverstein did anything other than appropriately present their sincere concerns to the Executive Committee and properly vote to recommend to the Board that Plaintiff be terminated for cause.[133]  Defendants maintain that Plaintiff has not established that the actions taken by Dr. Schneider or Dr. Silverstein exceeded the scope of their responsibilities as employees, officers, and directors of the company, or that Schneider or Silverstein acted out of personal animus.[134]

### iii. Defamation

Defendants argue that Plaintiff has only identified four specific allegedly defamatory statements, in either summary judgment briefing or argument: (1) Dr. Schneider told members of the Executive Committee that Plaintiff "had engaged in labor law violations"; (2) Dr. Schneider "falsely informed members of the Executive Committee that [Plaintiff] had previously been counseled on these issues and failed to make the necessary corrections"; (3) Dr. Schneider falsely informed the board that Plaintiff "had unilaterally changed a physician contract[,] which damaged the company"; and (4) Dr. Silverstein told Dr. Richard Stern, another ASPA physician, that  Plaintiff "was involved with an HR situation that exposed the corporation to liability."[135]   However, Defendants argue that it is notable that no specific

---

[131] Answering Brief, Item 81, at 17-18 (*citing MCG Capital Corp. v. Maginn*, 2010 WL 1782271, *12,  n.66 (Del. Ch. May 5, 2010)).

[132] Answering Brief, Item 81, at 18 (*citing Goldman v. Pogo.com*, 2002 WL 1358760, *8 (Del. Ch. June 14, 2014)).

[133] Answering Brief, Item 81, at 19.

[134] Answering Brief, Item 81, at 19-20.

[135] Answering Brief, Item 81, at 20-21.

allegedly defamatory statements are identified in Plaintiff's post-trial briefing.[136]  Instead, Plaintiff refers generally to remarks by Dr. Schneider about "labor issues" related to Plaintiff and Plaintiff's "alleged statement against Dr. Silverstein's interest."[137]  Further, Plaintiff only vaguely alleges publication to a third party and damages, stating only that "[t]he full impact of these damaging statements [is] not yet known since it is impossible to know to whom the statements were made."[138]

With respect to the four specific statements previously identified, Defendants argue that Plaintiff did not present any evidence that the first two statements were ever actually made—"nobody testified that Dr. Schneider told the other members of the Committee that Plaintiff had 'engaged in labor law violations' or that she had been 'previously counseled on these issues and failed to make the necessary corrections.'"[139]  With respect to the third statement, Dr. Schneider admitted making a comment concerning his subjective belief that Plaintiff had changed a physician contract and testified that he continues to believe that this is true.[140]  Defendants argue that there is no evidence that the statement was false or that it was made with negligence or ill intent.[141]  Regarding the fourth statement, Defendants point out that the only person who is alleged to have heard the statement (Dr. Stern) testified at trial that he did not consider the remark as intended to disparage Plaintiff.[142]

Finally, Defendants argue that even if these statements were made and published as Plaintiff contends, they were all made in the context of an employer-employee relationship

---

[136] Answering Brief, Item 81, at 21.
[137] Answering Brief, Item 81, at 21.
[138] Answering Brief, Item 81, at 21 (*citing* Opening Brief, Item 79, at 24).
[139] Answering Brief, Item 81, at 22.
[140] Answering Brief, Item 81, at 22 (*citing* T2 at 73-74).
[141] Answering Brief, Item 81, at 22.
[142] Answering Brief, Item 81, at 23 (*citing* T1 at 208-209).

and hence are presumptively subject to a qualified privilege.[143] This means that not only must Plaintiff prove each of the ordinary elements of defamation, but Plaintiff must also show that the statements were made with actual malice, which Defendants contend the evidence does not support.[144]

## C. Plaintiff's Reply Brief

In her reply brief, Plaintiff addresses Defendants' counterarguments concerning the main claim for constructive discharge and the related claim for tortious interference.[145] Plaintiff does not further address the defamation claim. Plaintiff reasserts that she can now make a constructive discharge claim even though her original claim was for actual discharge and argues that the doctrine of judicial admission does not apply under the present circumstances. Plaintiff suggests that the judicial admission doctrine only applies where one party has made a statement of fact that has not been subsequently challenged by the other party.[146] Plaintiff distinguishes two cases in which the court applied the doctrine of judicial admission from the instant case.

In *Merritt v. United Parcel Service*, the defendant conceded the partial disability of the plaintiff, and the plaintiff, in reliance on the defendant's admission, did not present any medical expert testimony.[147] As Plaintiff characterizes the holding, the *Merritt* Court found that the defendant had made a binding admission "since there was no other evidence offered on the subject" and because a finding to the contrary allowing the defendant to disavow his

---

[143] Answering Brief, Item 81, at 23.
[144] Answering Brief, Item 81, at 23 (*citing Gilliland v. St Joseph's at Providence Creek*, 2006 WL 258259, *9 (Del. Super. Ct. Jan 27, 2006)).
[145] Reply Brief, Item 82.
[146] Reply Brief, Item 82, at 5.
[147] Reply Brief, Item 82, at 5 (*citing Merritt v. United Parcel Service*, 956 A.2d 1196 (Del. 2008)).

admission would prejudice the plaintiff who had relied on it in deciding not to present a medical expert.[148] Similarly, in *Krauss v. State Farm*, one of two co-plaintiffs admitted that the two plaintiffs were part of the same household for insurance purposes.[149] There was no other evidence offered regarding this issue.[150] In this context, the court found that in light of this uncontroverted admission by a plaintiff, the insurance company was relieved from having to prove the issue at trial.[151] Plaintiff argues that the instant case is very different from either *Merritt* or *Krauss* as the issue of whether Plaintiff was terminated or resigned was disputed by the parties and testimony was offered on both sides.[152]

Plaintiff argues that Defendants are incorrect in their contention that the UIAB cases cited by Plaintiff have no precedential value to the instant case.[153] Instead, Plaintiff argues that in defining constructive discharge in Delaware, courts have included Delaware unemployment decisions as support and have made no distinction between unemployment cases and cases that do not involve unemployment benefits.[154]

Plaintiff also argues that Defendants are incorrect to suggest that a reasonable employee would have waited before resigning when confronted by the Executive Committee's findings.[155] Plaintiff says that Defendants were incorrect to conclude that Plaintiff would have had the opportunity to go before the Board or to challenge the Executive Committee's decision; "[t]o the contrary, Plaintiff was repeatedly told that the Executive

---

[148] Reply Brief, Item 82, at 5.
[149] Reply Brief, Item 82, at 6 (*citing Krauss v. State Farm Mut. Auto. Ins.*, 2004 WL 2830889 (Del. Super. Ct. Apr. 23, 2004)).
[150] Reply Brief, Item 82, at 6 (*citing Krauss*, 2004 WL 2830889).
[151] Reply Brief, Item 82, at 6 (*citing Krauss*, 2004 WL 2830889, at *5.)
[152] Reply Brief, Item 82, at 7.
[153] Reply Brief, Item 82, at 8. Plaintiff argues that the case cited by Defendants, *Meades v. Wilmington Housing Authority*, 2003 WL 939863, *6 (Del. Ch. Mar. 6, 2003), is not applicable to the instant case as it concerns the issue of willful misconduct rather than constructive discharge.
[154] Reply Brief, Item 82, at 9 (*citing Bali v. Christiana Care Health Services*, 1998 WL 685380 (Del Ch. Sept. 22, 1998)).
[155] Reply Brief, Item 82, at 10.

Committee unanimously [decided] that she was being terminated for cause."[156] Plaintiff maintains that she was never provided with any information about how to challenge the Executive Committee's decision and that "the circumstances presented at [the April 16] meeting made it clear to the Plaintiff that her days at ASPA were done."[157] Dr. Schneider told Plaintiff that the issues were "non-recoverable."[158] Plaintiff maintains that resignation would be a reasonable response in the face of what appeared to be imminent and unavoidable termination.

Concerning tortious interference, Plaintiff suggests that Defendant Schneider should be held liable for "spearhead[ing]" the action leading to Plaintiff's separation from the company.[159] Plaintiff says that Defendants are wrong to suggest that Schneider was simply acting within the scope of his duties as CEO. Instead, Plaintiff says that Dr. Schneider purposely concealed the findings of his investigation of Plaintiff from the other decision makers and/or often provided them with information that was not truthful, and that the Executive Committee relied on these false representations in making its decision to recommend termination of Plaintiff.[160]

## VI. DISCUSSION

### A. Plaintiff's Constructive Termination Claim is not Barred

Defendants argue that Plaintiff's constructive termination claim is barred as (a) constructive termination requires that the employee resigned, and (b) it was Plaintiff's

---

[156] Reply Brief, Item 82, at 10.
[157] Reply Brief, Item 82, at 10.
[158] T2 at 71.
[159] Reply Brief, Item 82, at 12.
[160] Reply Brief, Item 82, at 12.

considered position in the pleadings and at trial that she did not resign but was terminated.[161] After an extensive review of the briefings and the case law, the Court finds that the claim is not barred under the specific circumstances of this case. While it is a general principle that a litigant is bound by her factual assertions, particularly in the pleadings,[162] the Delaware Supreme Court has made clear that the rule only holds where the court relied on the factual assertions.[163] Particularly where there has been a judicial determination to the contrary of previously alleged facts, the litigant is permitted to adopt the judicial determination going forward.[164]

In *Siegman*, the plaintiff, a stockholder of the defendant corporation brought suit challenging the validity of the issuance of series preferred stock.[165] After the initiation of the suit, the defendant filed Certificates of Correction, which defendant argued cured the original deficiencies in the issuance of the stock.[166] The plaintiff maintained that the Certificates of Correction did not cure the original invalid issuances of the series preferred because the Certificates could not operate retroactively under the circumstances.[167] Nonetheless, the court

---

[161] *See, e.g.,* Complaint, Item 1, at 2 (In the "Factual Background" section, there is a subsection entitled "Plaintiff's Termination from A.S.P.A." ); T3 at 163 (In Plaintiff's closing argument, counsel stated, "the evidence is very clear and that what was conveyed to Miss Masterson-Carr on that day during that meeting is that she was terminated. She was absolutely terminated[,] and she was told that she had to leave the building, that she would not be permitted to return, all of her belongings were taken that day that belonged to ASPA, and she was required to pack up her office and leave").

[162] *See, e.g., Krauss*, 2004 WL 2830889; *Merritt*, 956 A.2d 1196; *John B. Conomos, Inc. v. Sun Co.*, 831 A.2d 696, 712 (Pa. Super. 2003) (*quoting Wills v. Kane*, 2 Grant 60, 63 (Pa. 1853)) ("When a man alleges a fact in a court of justice for his advantage, he shall not be allowed to contradict it afterwards. It is against good morals to permit such double dealing in the administration of justice").

[163] *Motorola v. Amkor Technology*, 958 A.2d 852, 859-60 (Del. 2008) (explaining that "[J]udicial estoppel… prevents a litigant from advancing an argument that contradicts a position previously taken that the court was persuaded to accept as the basis for its ruling. The doctrine is not appropriate in all situations; parties raise many issues throughout a lengthy litigation such as this, and only those arguments that persuade the court can form the basis for judicial estoppel. Judicial estoppel operates only where the litigant's [new position] contradicts another position that the litigant previously took and that the Court was successfully induced to adopt in a judicial ruling") (internal quotation, citation omitted).

[164] *Siegman v. Palomar Medical Technologies*, 1998 WL 409352, *3 (Del. Ch. July 13, 1998).

[165] *Id.* at *1

[166] *Id.*

[167] *Id.* at *2.

25

held that the Certificates did retroactively validate the series preferred; and the plaintiff filed for an award of attorney's fees and expenses, despite having lost on the merits, on the ground that the lawsuit induced the defendants to file the Certificates of Correction, thereby creating the benefit of curing the deficiencies with the stock.[168] The defendants, citing the doctrine of "judicial estoppel,"[169] argued that plaintiff was precluded from arguing that she was entitled to fees for creating the curative benefit when it had been her position throughout the litigation that filing the Certificates of Correction would not fix the problem.[170] The court found that the doctrine of judicial estoppel prevents a litigant from advancing an argument that contradicts a position previously taken by the same litigant only when the court was persuaded to accept the previous position as the basis for its ruling.[171] The Delaware Supreme Court approvingly quoted *Siegman* in *Motorola v. Amkor Technology*.[172]

Like in *Siegman*, Plaintiff originally advanced one position, but now there has been a judicial determination to the contrary. Thus, the Court finds that Plaintiff is entitled to avail herself of the Court's previous finding that she resigned going forward, and that Plaintiff may now argue a constructive termination claim premised on the contention that she resigned.

### B. Plaintiff has not Established Constructive Termination

The Court agrees with Plaintiff that the concept of constructive termination is well-established in Delaware law, and that one of the two constructive termination scenarios is the "ultimatum to resign."[173] The concept of constructive termination is typically invoked in

---

[168] *Id*. at *3
[169] Judicial estoppel is the same principle as "judicial admission" as cited by Defendants in our instant case.
[170] *Siegman*, 1998 WL 409352 at *3.
[171] *Id.*
[172] *Motorola*, 958 A.2d at 859-60.
[173] *Ingleside Homes v. Gladden*, 2003 WL 22048205, *8 (Del. Super. Ct, Aug. 27, 2003).

unemployment insurance cases, where the claimant argues that he is entitled to unemployment benefits because his apparent resignation was in fact constructive termination.[174] The Court disagrees with Defendants' assessment that the unemployment insurance cases are not useful because of the different standard of review in these cases. The Court finds that these cases are still instructive in defining the parameters of what may reasonably qualify as constructive termination.[175]

In *Anchor Motor Freight*, the court affirmed the Unemployment Insurance Appeals Board ("UIAB") decision finding that the claimant was constructively discharged without just cause.[176] The claimant, who was pregnant at the time and due in July, was absent from work for two weeks due to illness in January. When she returned to work, she was told that she would no longer work the day shift as she had previously but would be assigned to rotating shifts instead.[177] Throughout the two months after her return to work, the claimant was constantly asked by representatives of her employer when she would be leaving.[178] Upon the advice of her doctor, the claimant told her employer that she would be able to work until the

---

[174] Under 19 *Del. C.* §3315, reasons that an individual will be disqualified from unemployment benefits include leaving work "voluntarily without good cause attributable to such work..." and being "discharged from the individual's work for just cause." The reason why an employee would want to argue constructive termination rather than resignation with good cause in the context of unemployment insurance benefits is that in the case of termination, the burden is on the employer to show just cause, whereas in the case of resignation, the burden is on the employee to show just cause. *Gladden*, 2003 WL 22048205 at *7.

[175] The standard of review for an Unemployment Insurance Appeals Board (UIAB) decision upon appeal to Superior Court is that the UIAB's decision must be "supported by substantial evidence" and "free from legal error." *Gladden*, 2003 WL 22048205 at *4. The decision of the UIAB will only be overturned if there is an error of law, abuse of discretion, or the decision "exceeds the bounds of reason." *PAL of Wilmington v. Graham*, 2008 WL 2582986, *4 (Del. Super. Ct. June 18, 2005). Thus, it is instructive to see in which cases the court has found the Board's determination on the issue of constructive termination to be within the "bounds of reason" such as to require upholding the UIAB's decision.

[176] *Anchor Motor Freight v. Unemployment Ins. Appeal Bd.*, 325 A.2d 374, 375 (Del. Super. Ct. 1974).

[177] *Id.*

[178] *Id.*

end of June.[179]  However, the changes in the claimant's work schedule eventually prompted her to ask for a leave of absence in March.[180]

On the day the claimant requested the leave of absence, the claimant's supervisor, who was also her brother, presented her with a letter of resignation prepared by the employer.[181] Her supervisor told her that if she did not sign the letter, she would not receive her last paycheck or her vacation checks and would be fired as well.[182]  He urged her to sign the letter lest a discharge blemish her employment record.[183]  The Board found that the claimant had been constructively terminated, and the court agreed, finding that the claimant's signing the resignation letter was not "voluntary," defined as "proceeding from one's own choice or full consent."[184]

In *PAL of Wilmington v. Graham*, the claimant originally worked as an administrator for her employer, PAL of Wilmington, and then subsequently accepted a position as Director of Programs.[185]  After she had begun working as Director of Programs, the claimant received a performance evaluation, which said that the claimant demonstrated deficiencies in areas essential to her position.[186]  The employer created a 60 day "performance plan" to address these alleged deficiencies, which included a reevaluation of the claimant's progress after the first 30 days.[187]  The objective of the plan was "to present again to [claimant] the tasks for which she is responsible, evaluate progress toward successful completion of these tasks, and determine what, if any, role [claimant] will have in the [employer] organization going

---

[179] *Id.*
[180] *Id.*
[181] *Id.*
[182] *Anchor Motor Freight,* 325 A.2d at 375.
[183] *Id.*
[184] *Id.* at 376.
[185] *PAL of Wilmington v. Graham*, 2008 WL 2582986, *1 (Del. Super. Ct. June 18, 2005).
[186] *Id.*
[187] *Id.*

forward."[188] During the 60 days, the claimant was to "provide a weekly written status of her work and meet weekly with the Executive Director [of the organization] to review progress with these assignments."[189] At the end of the first 30 days, the claimant's performance was to be "reviewed, at which time [the employer would] take corrective action if necessary[,] up to and including termination."[190]

Before implementing the plan, the employer asked the claimant to sign it.[191] The claimant refused to sign, interpreting the plan as addressing her duties in her previous lower position rather than her current position, and submitted her resignation.[192] The claimant maintained that she interpreted the performance plan as an ultimatum.[193] The employer accepted the resignation, but disputed in writing the very next day that claimant was given an ultimatum.[194] However, at the hearing before the UIAB, the same representative of employer who wrote that there was no ultimatum testified that claimant was in fact given an ultimatum to sign to evaluation.[195] The Board concluded that the performance plan "was clearly an ultimatum, which at least implied the intention to terminate the claimant at the end of 30 days."[196] Because the employer produced "no competent evidence of misconduct" such as would constitute just cause for termination, the Board concluded that the claimant was constructively terminated without just cause.[197]

The court affirmed, finding the UIAB's decision was supported by substantial evidence. The court explained, that while the claimant "was not explicitly forced to sign the

---

[188] Id.
[189] Id.
[190] Id.
[191] Graham, 2008 WL 2582986 at *1.
[192] Id.
[193] Id.
[194] Id. at *1-2.
[195] Id. at *2.
[196] Id.
[197] Graham, 2008 WL 2582986 at *2.

29

evaluation plan, the wording of the plan was laden with implicit threats that [the claimant] would be terminated."[198] The court found that "[t]he language of the plan suggested, at least implicitly, that [the claimant] must either accept the new evaluation, which mainly addressed her old position, or risk termination."[199] The threat of termination was supported by the testimony of the employer's representative who testified that the claimant "exhausted her administrative remedies" by voicing disagreement with the plan and documenting her disagreement.[200]

The Court finds that Plaintiff has not established that she was presented with an ultimatum to resign such as would constitute constructive termination. At trial, Dr. Schneider testified that during the April 16, 2012 meeting, he explicitly told Plaintiff that she was not being terminated but only that the Executive Committee was recommending termination.[201] Schneider's account was confirmed by the testimony of the other three employer representatives present at the meeting, Dr. Lucente, Mary Quinn, and Dr. Chua, all of whom testified that Plaintiff was told that the Executive Committee would be making the *recommendation* that she be terminated.[202] The Court finds the consistent testimony of Dr. Schneider, Dr. Lucente, Mary Quinn, and Dr. Chua credible, and finds that the employer representatives clearly communicated to Plaintiff that their recommendation to the Board was merely that.

The instant case is clearly distinguishable from the UIAB cases in which the Court has upheld a finding of constructive termination. In *Anchor Motor Freight*, the employer representative presented the claimant with an employer-prepared resignation letter and

---

[198] *Id.* at *7.
[199] *Id.*
[200] *Id.*
[201] T2 at 70-71.
[202] T3 at 17-18; T3 at 79; T3 at 208.

suggested that she sign it.[203] The employer representative urged the claimant to sign the resignation letter in order to receive her last paycheck and her vacation checks, and to avoid having a blemish on her employment record.[204] In the instant case, the members of the Executive Committee did not present Plaintiff with any letter of resignation to sign at the time of the alleged ultimatum, instead asking that Plaintiff follow up with a written letter confirming her resignation.[205] There was no testimony that Plaintiff was urged to resign in order to receive paychecks or to preserve her future employment prospects as was the claimant in *Anchor Motor Freight*. Dr. Chua testified that Dr. Schneider only mentioned the need for Plaintiff to sign paperwork in order to receive her severance pay after Plaintiff had already said that she resigned.[206] It is undisputed that nothing was signed by Plaintiff at the April 16, 2012 meeting, which was what necessitated Dr. Schneider's subsequent email and April 30, 2012 letter, trying to get Plaintiff to put her resignation in writing.[207]

Unlike in *Graham*, Plaintiff was not presented with a "performance plan," created by her employer to address deficiencies in her job performance.[208] The performance plan was an official communication on behalf of the employer, which made clear the employer's dissatisfaction with the claimant's job performance, hence operating as an ultimatum. The employer's representative even confirmed in testimony before the UIAB that the performance plan was an ultimatum.[209] The instant case is different. It was clear from the beginning that members of the Executive Committee present at the April 16, 2012 meeting were acting only as members of the Executive Committee and not on behalf of the employer. It was also clear

---

[203] *Anchor Motor Freight*, 325 A.2d a7 375.
[204] *Id.*
[205] T2 at 71.
[206] T3 at 208.
[207] Schneider Email, Joint Ex. 34; Letter to Masterson-Carr, Joint Ex. 29.
[208] *See Graham*, 2008 WL 2582986, at *1.
[209] *Id.* at *2.

31

that the members of the Executive Committee were communicating a mere recommendation, rather than a final decision. The Court accepts Dr. Schneider's trial testimony that he unequivocally told Plaintiff that it was the *recommendation of the Executive Committee* that she be terminated, but that this decision would be put before the Board.[210] With a few days after the meeting, Schneider sent a follow-up email restating that termination was the recommendation of the Executive Committee, but that Plaintiff had been given the option to resign.[211]

As an ASPA administrator, Plaintiff clearly understood the respective powers of the Board and the Executive Committee and was familiar with ASPA termination procedure.[212] When asked who could terminate her employment contract, Plaintiff testified that it was her understanding that it was the Board of Directors.[213] In this context, the Court finds that Plaintiff could not have reasonably interpreted the content of the April 16, 2012 meeting as an ultimatum. Plaintiff was aware that the Executive Committee could merely make a recommendation. While Plaintiff may have decided, based on her own speculation about how the Board would react to the Executive Committee's recommendation, that she would probably face termination in the near future, this is not tantamount to an ultimatum from her employer. An employee is not constructively terminated merely because she sees the writing on the wall and decides to avoid the perceived likelihood of termination by resigning.

---

[210] T2 at 70-71.

[211] Schneider Email, Joint Ex. 34

[212] Plaintiff testified that she participated with all terminations, including those of physicians, nursing staff, and administrative staff. T1 at 65. Plaintiff also testified that the termination policy was the same for all ASPA employees regardless of their classification. T1 at 67.

[213] T1 at 28.

## C. Plaintiff has failed to Establish Tortious Interference or Defamation

The Court finds that Plaintiff has not established tortious interference with contract or defamation. First, regarding tortious interference, the Court notes ASPA is not a proper defendant as a party to a contract cannot be held liable for tortious interference with that contract.[214] Plaintiff appears to be aware of this fact and to only be alleging tortious interference against Dr. Schneider and Dr. Silverstein individually.[215] Regarding Defendants Schneider and Silverstein, Plaintiff makes only vague allegations they "acted in concert to ensure that [Plaintiff's] employment with ASPA would be terminated."[216] However, Plaintiff alleges no specific actions by Dr. Silverstein towards this alleged nefarious purpose, aside from his alleged statement to the Executive Committee that he felt that he would no longer be able to work with Plaintiff.[217] Regarding Dr. Schneider, Plaintiff makes the general claim that Schneider "took very specific, unilateral, and often secretive action to ensure the termination of Plaintiff's contract."[218] Plaintiff also alleges, with only slightly more specificity but without any supporting evidence, that Schneider fostered misimpressions among members of the Executive Committee concerning the extent of his investigation of Plaintiff's alleged

---

[214] *See, e.g., Tenneco Automotive v. El Paso Corp.*, 2007 WL 92621, *5 (Del Ch. Jan. 8, 2007) ("After all, a defendant cannot interefere with its own contract") (internal quotation, citation omitted).

[215] Complaint, Item 1, at 10; Opening Brief, Item 79, at 20.

[216] Opening Brief, Item 79, at 22. Plaintiff is correct that Dr. Schneider and Dr. Silverstein are not shielded from liability for tortious interference as officers or directors of ASPA if, as Plaintiff alleges, they used wrongful means. *Smith v. Hercules*, 2002 WL 499817, *3 (Del. Super. Ct. Mar. 28, 2002) (*holding* that a CEO may be liable for inducing breach if the plaintiffs can establish that his actions "were not motivated by, and for, his corporate responsibilities, but were instead principally executed to further his personal investments"). The Court also notes that, contrary to Defendants argument, a claim for tortious interference does not require that breach of contract actually result. *ASDI, Inc. v. Beard Research*, 11 A.3d 749, 751 (Del. 2010). Courts have found tortious interference where the actions of a defendant cause third parties to lawfully terminate a contract with the plaintiff. *Id.* Nonetheless, the Court finds Plaintiff's claim for tortious interference insufficient on other grounds.

[217] Opening Brief, Item 79, at 22.

[218] Opening Brief, Item 79, at 20.

misconduct, whether Plaintiff would be given an opportunity to confront the individual who reported the alleged misconduct, and whether Plaintiff had performance issues in the past.[219]

Dr. Schneider testified that he perceived problems with Plaintiff's job performance. Schneider said that he found Plaintiff "to be very difficult to work with in some situations[,] and she did not receive feedback very well around certain issues."[220] Schneider further testified that Mary Quinn communicated concerns that Plaintiff was responsible for "[HR] practices in the office… that would potentially expose the company to liability," and that he discussed these concerns at length with Mary Quinn.[221] Schneider also confirmed that Tina Smith reported that Plaintiff had gossiped about a doctor's alleged affair, and that Schneider discussed this matter with members of the Executive Committee.[222] The Court finds that while the trial testimony unequivocally establishes that Dr. Schneider had concerns with Plaintiff's job performance, Plaintiff presented no evidence that Schneider's concerns regarding her job performance were not sincere or that he mislead the other members of the Executive Committee with regard to the existence of these issues, the extent of his investigation into these issues, or whether Plaintiff would be permitted to confront individual(s) who reported alleged misconduct.

The Delaware Supreme Court confronted similar facts in *Nye v. University of Delaware*.[223] In *Nye*, the executrix of the estate of a former university dean filed suit for breach of contract and tortious interference with contract based on the university's failure to reappoint the dean to a third term. Per university policy, the dean was evaluated by a review committee, which in turn made a recommendation to the Provost, who made a

---

[219] Opening Brief, Item 79, at 21.
[220] T2 at 49.
[221] T2 at 52-53.
[222] T2 at 56-58.
[223] *Nye v. University of Delaware*, 897 A.2d 768 (Table), 2006 WL 25003 (Del. 2006).

recommendation to the university President.[224]    The ultimate decision on a dean's reappointment rested with the President.[225]    The plaintiff accused the Provost of "improperly influencing the committee's decision to recommend [the dean] not serve a third term as Dean."[226]    The trial court granted summary judgment to the defendants on tortious interference, and the Supreme Court affirmed.

The *Nye* Court explained that the plaintiff had failed to make a prima facie case of tortious interference, offering only "vague out-of-court statements of [the Provost,] which [the plaintiff] suggests, a finder of fact could interpret to find [that the Provost] intended to interfere with [the dean's] contract."[227]    Because the Provost was an agent of the university, finding him liable required a showing that the Provost acted outside the scope of his authority, interfering for a motive separate from his duties to the university.[228]    The Court found that plaintiff had made no such showing and explained that summary judgment is proper where "a plaintiff opposing a motion for summary judgment has had fair opportunity to conduct discovery to explore the defendant's subjective state of mind, yet cannot point to any evidence indicating that the defendant intended to deceive or to interfere."[229]

Like in *Nye*, the defendants Dr. Schneider and Dr. Silverstein were agents of the employer, meaning that Plaintiff must demonstrate that they acted outside the scope of their authority in interfering with Plaintiff's contract.  Plaintiff has presented only vague allegations that Schneider and/or Silverstein improperly influenced the Executive Committee by their statements and suggests reasons why Schneider and Silverstein may have acted out of

---

[224] *Id.* at *1.
[225] *Id.*
[226] *Id.*
[227] *Id.* at *3.
[228] *Id.*
[229] *Id.*

personal animus (namely that Schneider "did not appreciate the Plaintiff pointing out inconsistencies in his communication with the Board," and Silverstein "has a recent clash with [Plaintiff]," presumably over allegations that she had been gossiping about his extramarital affair).[230] The Court finds Plaintiff's generalized allegations, unsupported by any evidence, insufficient to establish that Defendants engaged in purposeful action, in excess of their authority as officers or directors, with the intent to harm the contractual relation.[231]

Plaintiff's allegations of defamation are similarly deficient. It is difficult to identify the specific alleged defamatory statements that Plaintiff is claiming. In her post-trial briefing, Plaintiff identifies two allegedly defamatory acts by Dr. Schneider: (1) that he "portrayed" Plaintiff "as an individual who is uncooperative in the face of necessary improvements" and did so without adequately investigating whether this portrayal was accurate; and (2) that he "was quick to let the physician members of the Executive Committee know that Plaintiff had, indeed, made the alleged statement against Dr. Silverstein's interest" before conducting a reasonable investigation.[232] Plaintiff alleges that Dr. Silverstein "supported" Dr. Schneider's second defamatory act by telling members of the Executive Committee that he could no longer work with Plaintiff knowing what she had said about him.[233] In their post-trial brief, Defendants cite four additional alleged statements that Plaintiff had previously identified as defamatory: (1) Dr. Schneider advised the Executive Committee that Plaintiff had engaged in labor law violations; (2) Dr. Schneider told the Executive Committee that Plaintiff had been counseled on these violations and had failed to make the necessary corrections; (3) Dr. Schneider told the Board that Plaintiff had unilaterally changed a physician contract, thus

---

[230] Opening Brief, Item 79, at 22.
[231] *UbiquiTel v. Sprint*, 2005 WL 3533697, *5 (Del. Ch. Dec. 14, 2005).
[232] Opening Brief, Item 79, at 23
[233] Opening Brief, Item 79, at 24.

damaging the company; and (4) that Silverstein told Dr. Stern that Plaintiff was involved with an HR situation that exposed the company to liability.[234]

It is well-established that there are four elements of a cause of action for defamation under Delaware law: (1) a false and defamatory statement concerning another; (2) unprivileged publication to a third party; (3) at least negligence on the part of the publisher; and (4) either actionability irrespective of special harm or special harm caused by publication.[235]

The two alleged acts of defamation cited by Plaintiff in her post-trial brief are strikingly thin. The first alleged act is not even a statement precisely, but rather a vague allegation that Dr. Schneider "portrayed" Plaintiff in a certain way. However, while there is no evidence in the trial record regarding particular statements, Dr. Schneider's testimony confirms that he did have concerns about Plaintiff's cooperativeness and ability to respond to criticism.[236] Regarding the second alleged act, Plaintiff does not argue that the statement was false, focusing instead on it having allegedly been made without adequate investigation. While this may be meant to suggest negligence on the part of Dr. Schneider, Plaintiff has certainly not demonstrated that Schneider's discussion of the allegation was improper. The Court accepts as credible Schneider's testimony that he was merely discussing the allegation made by Tina Smith, who claimed to have witnessed Plaintiff making the comment.[237] Regarding the other four alleged statements, there is evidence in the record that Dr. Schneider did, in fact, discuss these issues with other members of the Executive Committee.[238] However, there is no evidence in the record that Schneider's discussion of these issues was

---

[234] Answering Brief, Item 81, at 20-21.
[235] *Stevens v. Independent Newspapers*, 1988 WL 25377, *2 (Del. Super. Ct. Mar. 10, 1988).
[236] T2 at 49.
[237] T2 at 58-59.
[238] T2 at 49, 52-53, 56-58.

improper, negligent, malicious, or not otherwise in keeping with his role as Chairman of the Board.

The Court finds all of these alleged instances of defamation (both the two instances alleged in Plaintiff's post-trial briefing and the four previous statements cited by Defendants) subject to qualified privilege, as they were allegedly made in the context of Executive Committee official business and directly concerned Plaintiff's job performance. "A qualified privilege extends to communications made between people who have a common interest for the protection of which the allegedly defamatory statements that are made or which are disclosed to any person who has a legitimate expectation in the subject matter."[239]

When qualified privilege applies, a plaintiff must demonstrate actual malice, not just negligence, to succeed in a defamation claim.[240] Delaware courts have recognized qualified privilege allowing employers "to make communications regarding the character, qualifications, or job performance of an employee or former employee to those who have a legitimate interest in such information."[241] In *Lipson v. Anesthesia Services*, another case involving a claim for constructive termination from ASPA, the plaintiff physician alleged defamation against various agents of ASPA for comments concerning his professional competence, including that the plaintiff "nearly killed a kid" through his incompetence and "was having a mental breakdown."[242] At the summary judgment stage, the court held that the qualified privilege applied to the alleged comments because "all of the participants in the discussions and correspondence… did possess a legitimate expectation in the subject matter. All were either directors, shareholders, employees, or agents of ASPA who would have an

---

[239] *Gilliland v. St. Joseph's at Providence Creek*, 2006 WL 258259, *9 (Del. Super. Ct. Jan. 27, 2006) (internal quotations, citations omitted).
[240] *Id.*
[241] *Id.* (*quoting Lipson v. Anesthesia Services*, 790 A.2d 1261, 1281 (Del. Super. Ct. 2001)).
[242] *Id.* at 1283.

38

'expectation' (or interest) in [the plaintiff's] behavior as a representative of ASPA, or they were physicians involved in [the same hospital health system] who would have an 'expectation' in the quality of care and competency of a physician with whom they were expected to practice medicine."[243]  The court denied summary judgment because it found a factual question as to whether the plaintiff could demonstrate actual malice, the showing required to defeat the qualified privilege.[244]

The standard for actual malice is high.  A hostile relationship between the plaintiff and the defendant is not sufficient.  Once qualified privilege is established, it "is not forfeited by the mere addition of the fact that a defendant feels indignation and resentment towards the plaintiff and enjoys making such statements.[245]  The plaintiff bears the burden of showing "that the statements were made primarily to further interests other than those protected by the qualified privilege and that the chief motive for making such statements was the defendant's ill will.[246]

In the instant case, it is undisputed that the Executive Committee was charged with the day-to-day running of ASPA and with making recommendations to the Board on issues concerning employee performance.[247]  Concerns about Plaintiff's ability to cooperate and allegations that Plaintiff gossiped about coworkers were matters of legitimate interest to the other members of the executive committee.  Plaintiff has not demonstrated any actual malice on the part of either Dr. Schneider or Dr. Silverstein.  The closest that Plaintiff comes is to suggest that the two doctors may have had motives for personal animus as previously

---

[243] *Id*. at 1282 (internal quotation, citation omitted).

[244] *Id*. at 1283-84.

[245] *Battista v. Chrysler*, 454 A.2d 286, 291 (Del. Super. Ct. 1982) (*citing Coleman v. Newark Morning Ledger Co.,* N.J.Supr., 29 N.J. 357, 149 A.2d 193, 202 (1959)).

[246] *Id.* (*citing Sokolay v. Edlin*, N.J.Super., 65 N.J.Super. 112, 167 A.2d 211 (1961)).

[247] ASPA Bylaws, Joint Ex. 5, at 5, 7.

discussed. However, Plaintiff's mere suggestion of a possible motive is far from sufficient to demonstrate actual malice. The Court finds that that the alleged statements are protected by qualified privilege; since Plaintiff has not demonstrated actual malice, the statements do not qualify as defamatory.

Because the Court has found there is no legal basis to hold Defendants liable for damages on any of the asserted grounds, the Court will not address issues raised regarding the sufficiency of the pleadings or evidence regarding same.

## VII. CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff has failed to establish her claims for constructive discharge, tortious interference with contract, and defamation.

**IT IS SO ORDERED.**

_____/s/_____
**M. JANE BRADY**
Superior Court Judge